Filed 4/19/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BRANDON NELSON et al., | |
| Plaintiffs and Respondents, | G059565 |
| v. | (Super. Ct. No. 30-2019-01087833) |
| DUAL DIAGNOSIS TREATMENT CENTER, INC., et al., | OPINION |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Walter P. Schwarm, Judge. Affirmed.

Beach Law Group, Thomas E. Beach and Danyl C. Hottinger for Defendants and Appellants.

The Homampour Law Firm, Arash Homampour; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiffs and Respondents.

\*          \*          \*

Dual Diagnosis Treatment Center, Inc., doing business as Sovereign Health of San Clemente, and its owner, Tonmoy Sharma, (collectively Sovereign) appeal from the trial court's denial of Sovereign's motion to compel arbitration of claims asserted by Allen and Rose Nelson in their first amended complaint, including on behalf of their deceased son, Brandon Nelson.[1] The Nelsons alleged a cause of action for wrongful death and, on behalf of Brandon, negligence, negligence per se, dependent adult abuse or neglect, negligent misrepresentation, and fraud. According to the complaint, despite concluding that 26-year-old "Brandon requires 24 hour supervision ... at this time" after admitting him to its residential facility following his recent symptoms of psychosis, Sovereign personnel allowed him to go to his room alone, where he hung himself with the drawstring of his sweatpants.

The trial court denied Sovereign's motion to compel arbitration on two grounds. First, the court found Sovereign failed to meet its burden to authenticate an electronic signature as Brandon's on Sovereign's treatment center emollment agreement. The alleged agreement contained the arbitration clause on which Sovereign relied to compel arbitration.[2] Second, the trial court found that, even assuming Brandon signed the agreement, it was procedurally and substantively unconscionable, precluding enforcement against Brandon or, derivatively, his parents.

Sovereign challenges the trial court's authentication and unconscionability findings. As it did below, Sovereign also contends as a preliminary matter that the

---

[1] For clarity and ease of reference given the plaintiffs' shared last name, we refer to Brandon by his first name and intend no disrespect.

[2] Sovereign argued that Brandon's parents, though nonsignatories to the agreement, were bound to arbitrate under it because of their "unity of interest" with their son. According to Sovereign, this shared interest extended not just to the "survival" claims the Nelsons asserted on Brandon's behalf, but also to their wrongful death claim. The trial court did not reach these contentions-nor, based on our analysis, do we.

2

agreement delegated to an arbitrator-rather than the trial court-threshold questions such as the scope and enforceability of the agreement.

As we explain, Sovereign fails to demonstrate error. The trial court found it had the authority to determine preliminary issues of arbitrability such as the validity and enforceability of the emollment agreement. On our de novo review of that written document, we agree. The trial court also correctly found the agreement was unconscionable; that finding moots any question of whether Brandon actually signed it or whether his parents would have been bound by it if he did. We therefore do not reach the authentication question, and we affirm the trial court's order denying Sovereign's motion to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

In late January 2018, Brandon, a recent UCLA engineering graduate, suffered a sudden onset of symptoms of psychosis. He asked a friend who was a police officer for his gun so he could shoot himself because he felt "evil" and "like an animal." The officer contacted the Santa Monica Police Department; as a result, Brandon was committed on a 72-hour psychiatric hold (Welf. & Inst. Code,§ 5150 (section 5150)). Over the next six weeks, he received mental health treatment first at the Las Encinas Mental Hospital (LEMH) in Pasadena and later at Mission Hospital Laguna Beach (Mission Hospital).

Brandon's LEMH records included certification that he was **"GRAVELY DISABLED"** because he was "paranoid, delusional, fearful," and "feels he is being recorded." He was discharged from LEMH on or about February 23, 2018. His discharge lasted only three days. On February 26, he was again admitted on a section 5150 hold, this time at Mission Hospital as a result of a renewed threat to kill himself. That hospital's "Involuntary Patient Advisement" stated "You are being placed

3

in this psychiatric facility because it is our professional opinion, that as a result of a mental health disorder, you are likely to ... [if] Harm yourself."

On February 27, Brandon gave his father a durable power of attorney (DPOA) over his affairs, including those relating to his financial, legal, and "personal and family care." The DPOA specifically authorized Brandon's father "to enter into contracts and commit my resources with respect to the provision of my residential care in a convalescent hospital, skilled nursing home, or alternative residential facility."

On March 1st, a certification review found probable cause to extend Brandon's hold at Mission Hospital for 14 days because he was "[g]ravely disabled" and "[a] danger to himself." The certification described Brandon as unable to "mediate impulsivity" and exhibiting "poor insight" and "poor judgment." It further opined he was "easily frustrated," "disorganized," and his behavior was "mercurial" and "unpredictable."

Mission Hospital apparently discharged Brandon to Sovereign's care on March 7, 2018. According to the Nelsons' complaint, on the evening of March 6, a doctor determined that Brandon "needed continued inpatient care," but the next day around noon another doctor "ordered Brandon to be released home to his parents so that Brandon and [his parents] could find an appropriate facility with adequate licensing, services, and qualifications for Brandon's next phase of treatment." The complaint alleges Brandon was discharged without his parents' knowledge, and Sovereign was not equipped or licensed to handle his condition. According to the Nelsons, at Sharma's behest, Brandon was "shipped off to one of Sovereign's unlicensed sober living homes instead of being discharged to his family." The Nelsons allege that Sovereign "lacked the necessary licensing to provide any modicum of mental health treatment."

It is not clear from the record what time Brandon arrived at Sovereign's facility on March 7 or how he got there. Lori Sherlock, a Sovereign employee who electronically signed Brandon's emollment agreement that day, testified somewhat

4

inconsistently that she did not recall Brandon or "do[ing] his intake," but also that "he seemed agitated when we did the intake," so "I asked for a licensed professional to see him." According to Sherlock, Brandon was evaluated "that night at the house," which presumably references Sovereign's residential location.[3]

Diana Miltenburg, a Sovereign employee licensed as a clinical social worker, conducted a "Biopsychosocial Assessment" of Brandon on March 7.[4] The assessment described Brandon's "Precipitating Crisis" as follows: "Brandon reports that he is waiting for his medication to be delivered, that he has not had his medications for 'almost 24 hours'[.] Brandon states 'I am going to relapse if I don't get my medications .... "

The assessment indicated Brandon believed "people on tv [were] addressing [him]"; he was experiencing auditory hallucinations; and he was "acutely

---

[3]     Sherlock described her position, a "patient support specialist," as one in which Sovereign "tried to combine three different positions together, which was the patient advocate, the intake specialist, and the clinical concierge." Her declaration stated that while she did "not have a specific memory of signing [it]," Sovereign's "custom and practice" was "to present [its] Emollment Agreement with an arbitration clause to the resident ...   shortly before, at the time of, or shortly after the resident's initial admission to the facility."

The trial court made several observations regarding Sherlock's testimony, noting among other things that Sherlock repeatedly answered questions about Sovereign's intake practices at her deposition this way: "Same answer, [t]here's no protocol." Ultimately, the court found that Sovereign "does not have a custom and practice regarding the presentation of the Emollment Agreement." The court similarly found the defendants "have not carried their burden of authenticating Brandon Nelson's signature on the Emollment Agreement." As noted at the outset, given the trial court's unconscionability finding, which we uphold on our de novo review, we need not and do not address Sovereign's challenge to the court's authentication ruling.

[4]     The assessment lists Brandon's "Time of Admission" as "6:53 p.m.," but does not indicate whether that was when he first arrived at a Sovereign facility, when he completed an intake process (including allegedly signing an emollment agreement), when Miltenburg conducted her assessment, or some other time.

5

aware that his state of mind was impaired."  Brandon displayed "[e]xtreme psychomotor agitation" and "curled up in [a] fetal position"; he howled, yelled, and shouted, and, at least initially, "was able to engage" only "minimally in conversation." Brandon's intermittent "[y]elling and shouting," in which he pleaded "for the negative thoughts in his head to 'STOP,' [i]ncreased throughout the interview," and then "[d]ecreased after taking his medications."

The assessment stated under "Issues with Concentration" that Brandon was "[u]nable to focus and concentrate for more than 10-20 seconds at a time."  The assessment elsewhere described Brandon as having "limited attention span, concentration and focus."

Under a "Relapse Potential" heading on the assessment, the Sovereign interviewer placed a checkmark in the yes box for the question: "Has patient failed a lower level of care?" In the next field, in response to the prompt, "If yes, explain," the interviewer wrote:  "Brandon requires 24 hour supervision and support at this time. Without medications Brandon is at high risk of further psychological decompensation and loss of independent functioning."

Brandon hung himself the day following his admission. According to the Nelsons' complaint, Sovereign delayed providing Brandon with his psychotropic medications so that his prescription could be filled by a Sovereign-owned pharmacy. The complaint alleged that around 4:00 p.m. on March 8, 2018, Brandon began "screaming uncontrollably and exhibiting signs that he was a danger to himself." Sovereign did not give Brandon his medication until 6:20 p.m., but Brandon "began screaming once again around 7:00 p.m. and exhibiting signs that he was a danger to himself. Despite this, around 7:45 p.m., Sovereign allowed Brandon to go to his room unattended and unsupervised." There, he made a loop with the drawstring of his sweatpants and hung himself from an overhead fire sprinkler.

6

Brandon's parents filed suit in July 2019, and filed their first amended complaint in December 2019. Sovereign thereafter filed its motion to compel arbitration. The trial court denied the motion, finding Sovereign failed to meet its burden to authenticate Brandon's signature. The court also found the emollment agreement and, therefore, its arbitration provisions unenforceable due to the presence of both procedural and substantive unconscionability.

**DISCUSSION**

A core objective of both the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) and the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) is to ensure the enforcement of arbitration agreements '"in accordance with their terms."' *(Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59 *(Avery),* italics omitted.) Arbitration is fundamentally a matter of contract *(ibid),* and thus "[a] petition to compel arbitration is simply a suit in equity [to compel] specific performance of a contract." *(Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 *(Aanderud).)*

"The party seeking to compel arbitration "bears the burden of proving the existence of an arbitration agreement …." *(Aanderud, supra,* 13 Cal.App.5th at p. 890.) For its part, "the party opposing arbitration must prove any defense to the agreement's enforcement, such as unconscionability." *(Dennison v. Rosland Capital LLC* (2020) 47 Cal.App.5th 204, 209 *(Dennison).)*

I.    *Arbitrability*

Threshold determinations of what issues the parties agreed to arbitrate (if any) and the enforceability of their agreement may be resolved by an arbitrator, rather than the court presented with a petition to compel arbitration, if the parties so agree. "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *(Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 68-69.)

7

Similarly, "'[p]arties to an arbitration agreement may agree to delegate to the arbitrator, instead of a court, questions regarding the enforceability of the agreement."' *(Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227, 239.)

Sovereign contends the trial court erred as an initial matter in addressing the scope and enforceability of its arbitration agreement with Brandon because the agreement delegated the resolution of such questions to an arbitrator.

The answer to "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *(First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 943 *(First Options),* original italics.) "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ...   should apply ordinary state-law principles that govern the formation of contracts." *(Id* at p. 944.)

Under the objective theory of contracts, the best indicator of the parties' intent in a written contract is the words they chose for the agreement. *(Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955-956.) When no extrinsic evidence was admitted regarding the meaning of the terms of the contract, we examine the contract and language de novo to determine the parties' intent *(id* at p. 960), including on questions of arbitrability *(Aanderud, supra,* 13 Cal.App.5th at p. 890).

"Under California law, it is presumed the judge will decide arbitrability, unless there is clear and unmistakable evidence the parties intended the arbitrator to decide arbitrability." *(Dennison, supra,* 47 Cal.App.5th at p. 209.)

Sovereign insists the FAA applies rather than state law arbitration principles because its contract with Brandon "involve[d] interstate commerce." In support of its position, Sovereign relies on Sherlock's declaration in which she stated she was "aware that Sovereign Health communicated with out of state vendors, [and]

purchased and obtained equipment, supplies and goods from outside the State of California for residents' use and benefit at the facility."

Sovereign contends this alleged nexus with interstate commerce outweighs the agreement's specification of California law as "Governing Law." Sovereign's insistence on the FAA' s application is puzzling because there is no disagreement between California law and the FAA regarding arbitrability. Under both, until shown otherwise, "courts presume that the parties intend courts, not arbitrators, to decide ... disputes about 'arbitrability.'" *(BG Group, PLC v. Republic of Argentina* (2014) 572 U.S. 25, 34; accord, *Dennison, supra,* 47 Cal.App.5th at p. 209.)

In any event, to be effective, any attempted delegation cannot be equivocal or ambiguous. Instead, the issue of arbitrability presumptively remains with the court except "where 'the parties *clearly and unmistakably* provide otherwise.'" *(Brennan* v. *Opus Bank* (9th Cir. 2015) 796 F.3d 1125, 1130 *(Brennan);* accord, *Dennison, supra,* 47 Cal.App.5th at p. 209.) "[C]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *(First Options, supra,* 514 U.S. at p. 939.)

Sovereign argues the parties' intent to have an arbitrator determine questions of arbitrability is reflected implicitly in the broad language of their arbitration clause which states a general desire for disputes to be resolved "without litigation." Specifically, "The Parties" stated expressly in the "Dispute Resolution" section of the emollment agreement their "desire to resolve *any* dispute, whether based on contract, tort, statute or other legal or equitable theory *arising out of or related to* this Agreement ... or the breach or termination of this Agreement ... without litigation." (Italics added.)

While this language might permit an inference the parties intended that an arbitrator should resolve arbitrability questions (i.e., "any dispute"), such an intent is not clear and unmistakable. The clause does not mention arbitrability, nor is it mentioned anywhere else in the agreement. Arbitrability is a "rather arcane" subject *(First Options,*

9

*supra,* 514 U.S. at p. 945), and silence or ambiguity regarding arbitrability favors the presumption for judicial determination *(ibid).*

"Even broad arbitration clauses that expressly delegate the enforceability decision to arbitrators may not meet the clear and unmistakable test, where other language in the agreement creates an uncertainty in that regard." *(Ajamian v. CantorC02e, L.P.* (2012) 203 Cal.App.4th 771, 792 *(Ajamian).* Here, the agreement not only did not expressly delegate arbitrability to an arbitrator, it expressly contemplated court review of the validity and enforceability of the agreement: "If *a court* finds that any provision of this Agreement is invalid or unenforceable ...." (Italics added.) This broad power of review for validity and enforceability expressly extended to "any provision of this Agreement ... for any reason ......."[5]

Sovereign attempts to limit this broad authority by observing that it is conferred at the end of the agreement under a "Miscellaneous" heading. Sovereign points out that the dispute resolution section of the agreement has its own severability term under a heading entitled "Enforceability: "If any part *of this dispute resolution provision* is held to be unenforceable, it shall be severed and shall not affect either the duty to arbitrate or any other part of this provision." (Italics added.)

We are not persuaded. The "Severability" provision in the "Miscellaneous" section of the agreement expressly gave the court the authority to review the validity and enforceability of the agreement as a whole. This broad judicial authority to hold "any provision" of the agreement "invalid or unenforceable for any reason" precludes any

_____

[5]     In full, the "Severability" clause stated: "If any provision of this Agreement will be held to be *invalid or unenforceable for any reason,* the remaining provisions will continue to be valid and enforceable. *If a court* finds that *any provision of this Agreement* is invalid and unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed written, construed and enforced as so limited." (Italics added.)

conclusion that the parties clearly and unmistakably delegated arbitrability questions to an arbitrator.

Sovereign nonetheless argues arbitral delegation occurred "ultimately" by reference. That is, the agreement's arbitration provision specified "binding arbitration pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the 'Rules')." According to Sovereign, the applicable version of those rules provided that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim" and that "the arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part."[6]

At oral argument, counsel for Sovereign agreed that a copy of the AAA rules was never provided to Brandon. Sovereign nonetheless argues "that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."' *(Brennan, supra,* 796 F.3d at p. 1130.) *Brennan* limited its "holding to the facts of the present case, which *do* involve an arbitration agreement 'between sophisticated parties."' *(Id* at p. 1131, italics added.)

Neither *Brennan* nor Sovereign provide authority holding that incorporation binds an unsophisticated party. The two cases on which Sovereign relies in addition to *Brennan* did not consider the issue. *(Rodriguez v. American Technologies, Inc.* (2006) 136 Cal.App.4th 1110, 1123 *(Rodriguez); Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 557 *(Dream Theater).)*

Here, regardless of Brandon's sophistication or lack thereof, the emollment agreement itself resolves the arbitrability question against Sovereign. The agreement's

---

[6]     The AAA Commercial Arbitration Rules and Mediation Procedures that Sovereign includes in the record are 46 pages long, single-spaced.

broad severability language confirms the trial court's retained authority to resolve questions concerning the validity or enforceability of the agreement. None of the cases on which Sovereign relies for delegation-by-reference-to-arbitral-rules involved the parties' simultaneous express statement of broad judicial power to hold "any provision" of their agreement "invalid or unenforceable for any reason."

At best, the dual delegation presented by the facts here-to the arbitrator by reference to AAA rules, and to the court expressly-created uncertainty. Uncertainty or ambiguity as to whether arbitrability determinations have been delegated to the arbitrator cannot overcome the presumption for judicial determination of threshold issues. *(Ajamian, supra,* 203 Cal.App.4th at pp. 790-791.) "[W]here one contractual provision indicates that the enforceability of an arbitration provision is to be decided by the arbitrator, but another provision indicates that the *court* might also find provisions in the contract unenforceable, there is no clear and unmistakable delegation of authority to the arbitrator." *(Id* at p. 790.) As *Ajamian* observed, mere reference to arbitral rules may "tell[] the reader almost nothing, since a court *also* has power to decide such issues, and nothing in the AAA rules states that the AAA arbitrator ... has *exclusive* authority to do so ...." *(Id* at p. 789.)

Under these circumstances, Sovereign has not met its burden to defeat the applicable presumption. "[I]t is not enough that ordinary rules of contract interpretation simply yield the result that arbitrators have power to decide their own jurisdiction. Rather, the result must be clear and unmistakable, because the law is solicitous of the parties actually *focusing* on the issue. Hence silence or ambiguity is not enough." *(Gilbert Street Developers, LLC v. La Quinta Homes, LLC* (2009) 174 Cal.App.4th 1185, 1191-1192.)

As *Ajamian* explained: "[W]e must be mindful of what the United States Supreme Court has emphasized unflinchingly for decades: notwithstanding the public policy favoring arbitration, arbitration can be imposed only as to issues the parties agreed

12

to arbitrate; given the slim likelihood that the parties actually contemplated who would determine threshold enforceability issues, as well as the default presumption that such issues would be determined by the court, those threshold issues must be decided by the court absent *clear and unmistakable* proof to the contrary." *(Ajamian, supra,* 203 Cal.App.4th at p. 789.) That is the case here. The trial court did not err in its ruling.

2. *Unconscionability, Governing Law, and Sovereign's Contentions*

Sovereign challenges the trial court's findings that the emollment agreement was procedurally unconscionable, substantively unconscionable, and permeated by unconscionability. We disagree. Once again, the court did not err.

"Whether an agreement is unconscionable presents a question of law which we review de novo. But 'factual issues may bear on that determination. [Citations]. Thus, to the extent the trial court's determination that the ... agreement was unconscionable turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard."' *(Williams v. Atria Las Posas* (2018) 24 Cal.App.5th 1048, 1055.)

"'Unconscionability has procedural and substantive aspects."' *(Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 242 *(Carbajal).)* "Procedural unconscionability 'addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power."' *(Id* at p. 243.) "'[E]ven without any notable surprises,"' adhesion contracts ""bear within them the clear danger of oppression and overreaching."""" *(Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1244 *(Baltazar).)* Thus, the take-it-or-leave-it nature of an adhesive contract "is sufficient to establish some degree of procedural unconscionability." *(Sanchez v. Valencia Holding* Co., *LLC* (2015) 61 Cal.4th 899, 915 *(Sanchez).)* In

contrast, there is no procedural unconscionability in contracts "'that have been freely negotiated by roughly equal parties.'" *(Baltazar,* at p. 1244.)

Substantive unconscionability "'pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' [Citation.] This includes consideration of the extent to which the disputed term is outside the reasonable expectation of the nondrafting party or is unduly oppressive." *(The McCajfrey Group, Inc. v. Superior Court* (2014) 224 Cal.App.4th 1330, 1349-1350.) "The essential notion ... is '"that unconscionability requires a substantial degree of unfairness beyond a 'simple old-fashioned bad bargain.'"'" *(Carbajal, supra,* 245 Cal.App.4th at pp. 247-248.)

Procedural and substantive unconscionability "'must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree." *(Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114.) Essentially, the court must apply a sliding scale to its analysis: "'"[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."'" *(Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 247.)

In our de novo review, we tum first to procedural unconscionability. Sovereign disputes the trial court's procedural unconscionability findings, including whether Brandon was subjected to an adhesion contract and the effect of not furnishing him with the AAA arbitrability rules Sovereign sought to enforce. Sovereign also disputes the court's substantive unconscionability finding that the agreement was "harsh" and one-sided.

14

3. *Procedural Unconscionability*

Sovereign contends the emollment agreement was not adhesive because it expressly contemplated modification. Again, we disagree. The clear purpose of the provision on which Sovereign relies, which required that any modification "must be in writing and signed by the party obligated under the modification," is to forestall oral modification claims. (See Civ. Code, § 1698 [written agreements may be orally modified unless specified otherwise].) Similarly, the emollment agreement's integration clause does not authorize negotiation, confirm that it occurred (there was no evidence of negotiation), or contemplate further negotiation. Instead, it only affirms "[t]his Agreement contains the entire agreement of the parties."

The abstract possibility of a written modification does not demonstrate that the terms were either negotiated or negotiable. There is no evidence that Brandon had any bargaining power as a "sought-after" contractual partner. *(Carbajal, supra,* 245 Cal.App.4th at p. 244.) There is no evidence Brandon was *aware* he had any such power, either when he was admitted or at any later time.

Sovereign argues, relying on its intake coordinator's testimony, that because Sovereign on two unspecified occasions in the past allowed a client to stay overnight before signing an emollment agreement, that Brandon could have done so as well. No evidence indicated this option was communicated to Brandon.

In any event, a potential overnight deferral is not evidence of any possibility of negotiation. The coordinator said nothing about the terms of the emollment agreement being subject to negotiation or alteration or that Brandon could have done so here, or that he knew he had any such rights. Even sophisticated purchasers of luxury vehicles may not understand that the terms of a preprinted contract may be negotiable. *(Sanchez, supra,* 61 Cal.4th at p. 914.) "Moreover," as the Supreme Court has explained, "in the context of consumer contracts, [it has] never required, as a prerequisite to finding procedural unconscionability, that the complaining party show it tried to negotiate

15

standardized contract provisions." *(Ibid)* Sovereign's challenge to the adhesive nature of the contract is without merit.

"'[P]rocedural unconscionability requires either oppression or surprise."' *(Carbajal, supra,* 245 Cal.App.4th at p. 243.) By itself, an adhesion contract may present a low or modest degree of procedural unconscionability, but that can "rise[] to a moderate level" when the party drafting the agreement fails to provide a copy of the applicable arbitration rules. *(Id* at p. 244.) Sovereign contends Supreme Court authority undermines this basis for finding increased procedural unconscionability here. (See *Baltazar, supra,* 62 Cal.4th 1237.) We are not persuaded.

In *Baltazar,* the employer failed to provide the plaintiff with a copy of the AAA employment arbitration rules governing the dispute between them, but the Supreme Court held that alone was not enough to increase the procedural unconscionability of the contract or arbitration provision there. *(Baltazar, supra,* 62 Cal.4th at p. 1246.) The court nonetheless observed that the plaintiffs argument for an increased degree of procedural unconscionability, which would require greater scrutiny for substantive unconscionability, "might have force if her unconscionability challenge concerned some element of the AAA rules of which she had been unaware when she signed the arbitration agreement." *(Ibid.)* That is the situation here.

A conscientious reader who was considering signing the emollment agreement at issue here would likely be surprised to find the referenced AAA rules allocated authority for arbitrability-including enforceability- in a manner contrary to the express terms of the emollment agreement, as discussed above. It is oppressive to "' artfully hid[e]"' contract terms "by the simple expedient of incorporating them by reference rather than including them in or attaching them to the arbitration agreement." *(Baltazar, supra,* 62 Cal.4th at p. 1246.) This element of surprise and oppression distinguishes *Baltazar.*

The manipulative aspect of presenting important terms in a written contract and contrary terms elsewhere in an inaccessible manner is akin to furnishing a translation of only portions of a proposed agreement. (See *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 84-85 *(Carmona).)* In *Carmona,* the defendant "car wash companies hid the enforceability clause and the entire confidentiality subagreement by failing to translate that portion of the agreement into Spanish," while translating the rest of the contract for Spanish-speaking applicants. *(Id* at p. 85.) The record "d[id] not reveal why the car wash companies did not translate the entirety of the employment agreement," but the reviewing court found that "with both oppression and surprise present, there is no question the arbitration agreement was procedurally unconscionable." *(Ibid)*

Any "evaluation of unconscionability is highly dependent on context." *(Sanchez, supra,* 61 Cal.4th at p. 911.) A "'claim of unconscionability often cannot be determined merely by examining the face of a contract, but will require inquiry into its ... setting, purpose, and effect.'" *(Bolter v. Superior Court* (2001) 87 Cal.App.4th 900, 907.) While the trial court declined to find Brandon incompetent after sustaining Sovereign's objection to his expert's opinion regarding a lack of informed consent, we cannot ignore on our independent review Brandon's indisputably fragile mental state.[7] Whether or not it amounted to incompetence, "the imbalance of bargaining power is apparent." *(Carbajal, supra,* 245 Cal.App.4th at p. 244 [inexperienced student signing arbitration agreement as part of painting crew].)

At a minimum, Sovereign's assessment at or near intake indicating Brandon had "Issues with Concentration" is noteworthy; specifically, he was "[u]nable to

---

[7] We also wonder how a 26-year-old man in the throes of an acute psychotic episode could be legally competent but, due to our dispositional analysis, we need not resolve that issue here.

focus and concentrate for more than 10-20 seconds at a time." As in *Carmona,* a contracting party's inability to grasp proposed contract terms because of a reading comprehension barrier supports a finding of a "high degree of procedural unconscionability." *(Carmona, supra,* 226 Cal.App.4th at p. 85.) Doing so is akin to presenting written contract terms to a visually impaired person who is unlikely to be able to read and understand them, which supports a constructive fraud defense to enforcement of the contract. *(Brown v. Wells Fargo Bank, NA.* (2008) 168 Cal.App.4th 938, 958-960.)

While it is not clear when Sovereign presented Brandon with the emollment agreement, Sovereign's intake coordinator indicated it was "shortly before, at the time of, or shortly after the resident's initial admission to the facility." Sovereign's Biopsychosocial Assessment documented Brandon's impaired mental state in this very time frame, including his inability to focus or concentrate. Indeed, the intake coordinator called for a professional assessment of Brandon based on his agitated state at the same time she claimed she presented him with the emollment agreement.

These circumstances support the trial court's finding of procedural unconscionability. On our de novo review, the adhesive nature of the alleged contract, failing to provide Brandon with the AAA arbitrability terms on which Sovereign now relies while providing contrary terms in the emollment agreement it drafted, and Brandon's impaired mental state all combine to result in a high level of procedural unconscionability.

Nevertheless, "procedural unconscionability alone does not invalidate a contract." *(OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 130 (OTO).) Instead, "its existence requires courts to closely scrutinize the substantive terms 'to ensure they are not manifestly unfair or one-sided.'" *(Ibid)* "Substantive terms that, in the abstract, might not support an unconscionability finding take on greater weight when imposed by a procedure that is demonstrably oppressive." *(Ibid)* Where there is "substantial

procedural unconscionability ... , even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable." *(Ibid)*

      4.     *Substantive Unconscionability*

"Substantively unconscionable terms may 'generally be described as unfairly one-sided.'" *(Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 713.) ""'[T]he paramount consideration in assessing [substantive] conscionability is mutuality.""' *(Carmona, supra,* 226 Cal.App.4th at p. 85, original brackets.) Unilateral terms with "overly harsh effect[s]" are the hallmark of substantive unconscionability. *(Harper v. Ultimo* (2003) 113 Cal.App.4th 1402, 1407 *(Harper).)* Drastic limitations on one party's remedies support a finding of substantive unconscionability. *(Ibid; Penila v. Westmont Corp.* (2016) 3 Cal.App.5th 205, 222.)

In *Harper,* in the words of our departed colleague, Justice Sills, substantive unconscionability was "so present that it [was] almost impossible to keep from tripping" over it. *(Harper, supra,* 113 Cal.App.4th at p. 1407.) There, the defendant contractor allegedly broke a sewer pipe, causing concrete to spread throughout the plaintiffs' soil and into their backyard plumbing and sewer systems. The construction contract limited the remedies against the contractor to a refund, completion of work, or costs of repair or out-of-pocket loss or property damage-but capped total compensation at $2,500 unless the parties agreed otherwise in writing. *(Id* at p. 1405.) Such restrictive damages limitations are "'yet another version of a "heads I win, tails you lose" ... clause that has met with uniform judicial opprobrium.'" *(Lhotka v. Geographic Expeditions, Inc.* (2010) 181 Cal.App.4th 816, 825 *(Lhotka),* citing e.g., *Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094.)

Here, the contract imposed on Brandon not just a damages cap, but required a unilateral release of almost any conceivable claim he could assert against Sovereign. This is the opening sentence of the release section of the emollment agreement: "I release the Company from and agree not to sue the company for any liability, claim, suit,

or expense in any way associated with the Patient's participation in the company program or the use of any equipment or facilities in the company program." There was no corresponding limitation or waiver of claims Sovereign might make against Brandon.

Sovereign argues that "[i]nherent in an arbitration agreement is a waiver of trial by a jury," apparently focusing on Brandon's release of his right to sue and the contract's corresponding arbitration provisions. But the release at issue here is far broader than that: it explicitly extends to any *"claim* against the company as a result of any loss, injury, damage, or death suffered by the Patient." (Italics added.) The release is not limited to breach of the contract between the parties, but expressly "includes claims for personal injury, property damage, wrongful death, breach of contract, or any other type of suit." The release absolved Sovereign of taking precautions against "any injury or illness, which occurs while the Patient is emolled." The release relieved Sovereign of its duty to provide competent care or basic protection against tort harms by extending to "any losses caused or alleged to be caused, in whole or in part, by the negligence of the company......."

We note on our de novo review that these release provisions were not limited to Brandon, but instead purported to extend to third parties. The subsequent reimbursement and attorney fees provision made Brandon the financial guarantor against other program participants' conduct and even that of Sovereign's own staff members or "any other person" in any dispute arising from his presence at a Sovereign facility: "I further agree to defend and indemnify the Company to pay or reimburse the company for money it is required to pay, including attorney's fees and costs, with respect to any and all claims brought by or on behalf of a family member, a co-participant, or any other person for any claims related to Patient's participation in the program." In our view, this provision is more than unfair and one-sided-it is punitive.

We agree with the trial court's finding that the release provisions Sovereign imposed on Brandon in Section XV are "significantly harsh and one-sided." The

20

apparently total evisceration of any remedies for Brandon makes the lopsidedness of the contract even more extreme than that present in *Harper.* This is exacerbated in our view by the fact that the alleged contract was made "in the context of employment or medical care-i.e., contracts for "'life's necessities.'"" *(Lhotka, supra,* 181 Cal.App.4th at p. 823.) In light of the high degree of both procedural and substantive unconscionability present, the emollment agreement here was unquestionably unconscionable. (See *id* at p. 821 [sliding scale may "figure[] centrally in the analysis of the agreement"].)

        5.     *Severance*

        Sovereign offers no justification for the imbalance in its release requirements. Instead, Sovereign argues that as to the trial court's "only [express] finding regarding substantive unconscionability," the court should have severed Section XV of the emollment agreement. (Brackets added.) According to Sovereign, this would leave the rest of the agreement intact, including its dispute resolution provisions for an arbitrator to resolve the Nelsons' claims, albeit with the one-sided release excised.

        We review the question of severance for abuse of discretion. *(Lhotka, supra,* 181 Cal.App.4th at p. 821.) "Civil Code section 1670.5, subdivision (a) gives the trial court discretion to either refuse to enforce a contract it finds to be unconscionable, or to strike the unconscionable provision and enforce the remainder of the contract. ....... The trial court has discretion under this statute to refuse to enforce an entire agreement if the agreement is 'permeated' by unconscionability." *(Lhotka, supra,* at p. 826.) An agreement may be "permeated with too high a degree of unconscionability for severance to rehabilitate." *(Lange v. Monster Energy Co.* (2020) 46 Cal.App.5th 436, 455.) "'The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement.'" *(OTO, supra,* 8 Cal.5th at p. 126.)

Our review is informed by the fact that Sovereign did not request a statement of decision, nor did the Nelsons. Accordingly, we presume the trial court made all implied findings supporting its ruling, which we presume was correct. (*Carbajal, supra,* 245 Cal.App.4th at p. 237.) Moreover, we uphold the trial court's ruling if it was correct for any reason. *(Ibid)*

In addition to the one-sided release, the Nelsons point to other unconscionable provisions permeating the agreement and precluding severance, none of which Sovereign addresses. For instance, the agreement's arbitration provision purported to set a time bar of two years for all claims, thereby curtailing, as the Nelsons point out, a plaintiffs ability to seek redress for fraud within the statutory three-year period. (Code Civ. Proc.,§ 338, subd. (d).) While the time bar appeared to be neutral on its face, applying to "[a]ny claim by either Party," seemingly neutral limitations can be "nonmutual in effect." *(Baxter v. Genworth North America Corp.* (2017) 16 Cal.App.5th 713, 727 *(Baxter)* [discovery limitations].)

That is the case here, where Sovereign's principal purpose under the emollment agreement appears to have been to ensure payment for its services, while a plaintiffs claims-including the Nelsons-necessarily would be much more complex, requiring more time. (Assuming they could be asserted at all, given the release that Sovereign required.) In these circumstances, we conclude "[a]n arbitral limitations period that is shorter than the otherwise applicable period is one factor that supports a finding of substantive unconscionability." *(Magno v. The College Network, Inc.* (2016) 1 Cal.App.5th 277, 291; accord *Baxter, supra,* 16 Cal.App.5th at p. 731.)

The arbitration clause here also severely curtailed discovery. It restricted discovery interrogatories, "including subparts," and requests for admission to just 10 of each. The discovery provision allowed a party to produce all of *its* witnesses for deposition and at arbitral hearings, but appeared to limit its responsibility to produce witnesses not on *its* witness list to just "four other persons within such Party's control."

22

As the Nelsons explain, and Sovereign does not dispute, these provisions disproportionately disadvantage plaintiffs asserting fraud claims such as theirs. The Nelsons allege Sovereign's "deliberate pattern of fraudulent conduct" included "misrepresent[ing] the nature of the care it will provide and pay[ing] kickbacks and undisclosed referral fees so that patients will be directed to it." Proof of such allegations would likely require more than the limited discovery permitted in the arbitration agreement, which did not provide for "good cause" exceptions to its discovery rules. (See *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 183.) The *Baxter* court considered the IO-interrogatory limitation and found it, along with similar discovery limitations, unconscionable in complex cases. *(Baxter, supra,* 16 Cal.App.5th at pp. 727-730.) The same is true here.

The Nelsons contend, and Sovereign does not dispute, that the arbitration agreement's "gag rule" is also substantively unconscionable. The provision precluded "disclos[ure of] the facts of the underlying dispute" to third parties "without the prior consent of all Parties." In the employment context, "[s]uch provisions have a *one-sided* effect favoring the employer because they prevent the claimant from contacting other employees to obtain helpful information and prevent other employees from building similar claims." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2021) [if] 5:155.2k, original italics.) That is similarly the case here where the Nelsons' fraud and misrepresentation claims required exploring the factual basis of those claims with others.

In light of these factors, severing the emollment agreement's unconscionable terms and ordering the parties to arbitration was not a reasonable option. The arbitration agreement itself was rife with unconscionable terms. "'An agreement to arbitrate is considered "permeated" by unconscionability where it contains more than one unconscionable provision....'"Such multiple defects indicate a systematic effort to impose arbitration on [the nondrafting party] not simply as an alternative to litigation, but

as an inferior forum that works to the [drafting party's] advantage."'" *(Dennison, supra,* 47 Cal.App.5th at p. 213.) The trial court therefore did not err in its severance ruling or in denying Sovereign's motion to compel arbitration.

## DISPOSITION

The trial court's order denying Sovereign's motion to compel arbitration is affirmed. The Nelsons are entitled to their costs on appeal.

GOETHALS, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

24